### AMERICAN TRADING CO., Inc., v. THE HARRY CULBREATH et al.

### BALFOUR, GUTHRIE & CO., Limited, v. THE HARRY CULBREATH et al.

United States District Court
S. D. New York.

June 30, 1950.

Stanley W. Schaefer, New York City, for American Trading Co., Inc.

Hill, Rivkins & Middleton, New York City, Joseph R. Cannata, New York City, of counsel, for Balfour, Guthrie & Co., Limited.

Irving H. Saypol, U. S. Atty., New York City, Tompkins, Boal & Tompkins, New York City, Arthur M. Boal, and James M. Fulton, New York City, of counsel, for United States of America, S. S. Harry Culbreath, Lykes Bros. S. S. Co. and Isthmian S. S. Co.

Alexander & Ash, New York City, Edward Ash and Sidney A. Schwartz, New York City, of counsel, for John W. McGrath Corp.

Haight, Deming, Gardner, Poor & Havens, New York City, John C. Moore and Tallman Bissell, New York City, of counsel, for Alcoa S. S. Co., Inc.

CLANCY, District Judge.

Libellants in this case complain of short deliveries. Despite the fact that the trial produced a minimum of credible testimony, the Court is convinced that the entire cargo of the ship was discharged. A quantity equivalent to 652 boxes was sold for the account of the ship's owner as unmer-

chantable. It would seem to follow that the rest of the shortage was due to a failure of delivery to the vessel at Basrah and the fact of full and satisfactory delivery to all of the consignees excepting these two libellants casts a suspicion on the Basrah representative of libellant, American Trading Co. Inc. The unmerchantable dates would more than account for the loss of the Balfour, Guthrie & Co., Limited claim and the following discussion has to do only with the claim of American Trading Co. Inc. There was evidence of similar shortages startlingly in excess of the ordinary shortages encountered in later shipments to other consignees made under the same conditions as attended this shipment. An individual who testified that he was manager of this libellant was not otherwise questioned as to his financial interest in it if he had any. His brother was the owner of almost all of the stock of Gulf Trading Co., the shipper, which collected, fumigated and shipped the dates. It is quite probable that the individual who operated as checker on the steamship's deck during the loading operation was connected with the stevedores and may be one of their number. It remains a fact never the less that both the captain and the mate of the vessel referred to the checker as an employee of the ship's agent. In view of the rest of their depositions this may well be an ignorant statement but it was not contradicted. This checker made out tally sheets that were delivered to the mate who added up the contents of all the sheets without investigation and issued therefor to the ship's agent a receipt for the ship's cargo and it was on this mate's receipts that the bills of lading to the consignees were prepared. So, as a matter of fact, the ship in accepting the checker's report accepted liability for his count whoever the checker was and certainly the vessel's owner, when its agent issued the bills of lading accepted a heavy responsibility which only a convincing explanation could reduce. 49 U.S.C.A. § 88; 46 U.S.C.A. § 1303(3) and (4). We cannot say that the suspicion of short delivery to the vessel engendered by a process of exclusion of other possible causes of the shortage in delivery to the consignees is sufficiently convincing to overcome the execution and delivery of the bills of lading especially in default of clear evidence of the position and authority of the checker. The suggestion that only the shipper's statement of the number of boxes put aboard was accepted is not borne out by the language of the bills themselves and more definite evidence of actual calculable shortage. Consequently delivery to the ship is found of the quantity stated in the bills of lading and the ship's manifest. Since that quantity was not outturned or delivered to the libellants their claims are sustained.

The charges of responsibility made against the impleaded respondents never rose above the statue of a suggestion and the evidence of both these respondents shows even the suggestion groundless. In fact the only convincing evidence in this case proved the performance with due care of all of their duties by the impleaded respondents. The Court's determination is inconclusive as to the cause of the shortage. This is a necessary result of an insufficiency of evidence.

## Findings of Fact.

1. At all times hereinafter mentioned the steamship Harry Culbreath was owned by the respondent United States of America and operated for its account by Lykes Brothers Steamship Company, Inc. The berthing agent of the United States of America at the port of Basrah, Iraq, was the respondent Isthmian Steamship Company.

2. During late September and early October, 1945, a full cargo of dates comprising 239,442 cases of dates, according to its manifest, was put aboard the S. S. Harry Culbreath at Basrah. These dates were picked up at the premises of the various growers in the neighborhood of Basrah and carried in lighters to a fumigation plant. Each lighter held between 800 and 2500 cases and the head man in its charge received from the packer a boat note, a copy of which is signed as the packer's receipt. At the fumigation plant the boat note is delivered to the clerk in charge. When the lighter is unloaded the number of

cases aboard is said to be checked and after the fumigation process, when the dates are reloaded on the lighter, a new boat note from the fumigation plant is given to the lighter. The lighter then goes to the steamer and the lighter man then gives his boat note to some one who is apparently an employee of the stevedore though he was casually referred to as the representative of the mate. When the cargo is laden aboard the vessel the lighter man there usually receives a plain receipt or a mate's receipt and sometimes he gets neither. On the deck of the vessel is a tally clerk or checker who makes out tally sheets. These sheets in the case of this shipment were in turn delivered to the mate who added up their contents without investigation and issued therefor a receipt for the ship's cargo. It was on these mate's receipts that bills of lading to the libellants were prepared.

3. Andrew Weir & Co., an English concern, has a monopoly of the date exporting business at Basrah so thorough that it includes the boxes in which dates are exported. The financial arrangements covering the transportation of the cargo to the United States appear to be arranged in deference to this monopolist. The bills of lading to the two libellants were issued to Gulf Trading Co. as shipper naming the Bank of Iran as the consignee. The bank endorsed the bills to the order of The New York Trust Company which in turn endorsed them to the libellants. Gulf Trading Co. named as the shipper was operated by a brother of the manager of the libellant, American Trading Co. Inc., and he owns almost all its stock. Gulf Trading Co. is the representative in Basrah of the libellant, American Trading Co. Inc.

4. The vessel lacked dunnage and most, and probably all, of the sweat boards from the sides of the lower holds were removed and used as dunnage between the dates and the floors of the holds. There was no other dunnage between the tiers or between the tiers and the skin of the ship or whatever battens were suspended between the skins. There was room in all the lower holds between the skin of the ship or battens and the exterior side of the outward tier of dates. Cargo was stowed in some of the tween decks from skin to skin but short of the front or rear bulkheads without shoring or bracing so that the sway of roll and pitch thus worked damage to the stow. Some of the cargo was piled in the lower hold fifteen or more tiers high and some of the lower boxes were crushed. Some cargo was piled in the square of the hatch in some of the tween decks without shoring or bracing and part of the top tiers had toppled and smashed to the floor during the voyage. Some water is used during the process of packing dates and the juice exuding from the boxes in this shipment appears to have been profuse. It exuded through the boxes which were thereby frozen to a greater or less degree throughout the stow. The ship encountered stormy weather at one point of its voyage; indeed, it had to slow down for the best part of one day. During the delivery in New York, cold weather was encountered. The ship was unloaded by the impleaded respondent, John W. McGrath Corp., upon Pier K, Jersey City, owned by the impleaded respondent, Alcoa Steamship Co., Inc., on which was freight intended for its outgoing vessels. When the hatch covers were removed it was found that some of the bottom tiers, even in the tween decks where the piling of the cases was to a lesser height than in the deeper holds, had been crushed by the superimposed cargo. Some of the cargo piled without bracing or shoring had toppled as a result of the sway of the ship and the falling of the cases resulted in damage to them as containers and to their contents as well. It was further found that many of the boxes in the shipment were adhering to the boxes of the adjacent tiers. Thus there was no way to move them from the stow in many cases except with the use of longshoremen's hooks. The longshoremen put aside some of the more badly destroyed boxes and the contents of some of the hopelessly destroyed boxes and they did damage to other boxes through the use of hooks but the entire cargo was eventually delivered to the dock. During the stevedoring process the stevedore's carpenters recoopered many boxes and continued the recoopering proc-

ess on the dock throughout the process of delivery to the various consignees. It is found that the McGrath Company did its work on this cargo both aboard ship and on the dock in so far as they were there concerned with the skill and care demanded by the character and condition of the cargo as they found it and that nothing they did or left undone resulted in any damage to the cargo and that whatever damage they were compelled to do to the boxes in the course of the discharge operation they remedied by their own efforts. It is also found that nothing done or permitted to be done by the Alcoa S. S. Co., the owner of the dock, resulted in any damage to the cargo and that all of its duties as berth agent were performed with due care.

5. So much of the dates as were found loose and in irrecoverable condition during the unloading process were placed in 208 bags and in 252 cases, the whole quantity thus repacked being equivalent to the contents of 652 cases. These boxes and cases were sold for the account of Isthmian Steamship Company. Of the cargo 76,995 cases were consigned to one libellant, American Trading Co. Inc. and 46,969 cases to the other libellant, Balfour, Guthrie & Co., Limited. The delivery to American Trading Co. Inc. was 2,590 cases short and that to Balfour, Guthrie & Co., Limited, was 78 cases short. With the exception of an inconsiderable amount, the rest of the cargo consigned to other persons than these libellants was delivered to them in good condition.

6. The quantity of dates stated in the bills of lading and in the ship's manifest were delivered to the ship for carriage and the failure of outturn was not explained. It is found that the stowage was bad and that all of the damage represented by the 652 cases of unmerchantable cargo sold for the ship's account was due to bad storage. The cases were the cases used in the date trade and sufficient for their purpose.

### Conclusions of Law.

1. The respondent United States of America, as owner of the S. S. Harry Culbreath, is liable for the amount of the losses complained of by the libellants. The action is for breach of contract and neither Isthmian nor Lykes which acted as agents, as stated earlier, contracted in any capacity other than agent and were not guilty of tort and incurred no liability to the libellants.

2. Costs are allowed only against the United States of America to both libellants and to the impleaded respondents and are disallowed Isthmian Steamship Company and Lykes Brothers Steamship Company, Inc. against libellants.